In re INTERSTATE TRUST & BANKING
CO.

No. 17313.

Court of Appeal of Louisiana.   Orleans.

Feb. 26, 1940.

Rehearing Granted March 11, 1940.

Monroe & Lemann and Malcolm L. Monroe, all of New Orleans, for appellant.

Marcus & Corkern & Flanders and F. A. Kullman, all of New Orleans, for appellee.

JANVIER, Judge.

Mississippi Cotton Seed Products Company intervenes in the liquidation proceedings of Interstate Trust & Banking Company and claims $1,347.91 on the ground that, as the result of a combination of events and circumstances, the said bank in liquidation applied on account of the payment of a note the proceeds of a check which the said Products Company had given to the bank as security for the balance which might be shown to be due on the said note, without allowing credit on the note for $1,347.91, which was the amount of a deferred balance standing on the books of the bank—in a trust account of which the Products Company claims to have been the sole owner—and which, it asserts, should have been applied as an offset pro tanto against any balance due by it on its note.

The bank in liquidation admits the deferred credit balance on its books, but maintains that the Products Company was not entitled to have the said balance applied as an offset on its said note since it was not the sole owner of the said balance, and that, even if it was the owner of the said balance, it did not take the necessary timely steps to entitle itself to that offset, and that,

even if it was the sole owner and even if it did take the necessary timely steps to effect the offset, it later waived any rights which it might have had to the offset by giving to the said bank in liquidation a certified check to be used in payment of the note under certain conditions, which have been met. The said bank in liquidation, maintaining that the proceeds of the said check were not sufficient to pay the balance and the accrued interest due on the said note, claims the additional interest, (amounting to $169.74) which it asserts is due.

In the court, a qua, there was judgment maintaining the position of the bank in liquidation and the Products Company has appealed.

The reasons given by the district judge were that, when the Products Company delivered to the liquidators of the bank the certified check, it did so with a written agreement under which the liquidators surrendered certain rights and in which agreement it was in effect stated that should the liquidators decide to use the said check on account of the balance due on the note, they might do so after notice of their intention to do so given five days prior to the use of the check. The trial judge held that when, after receiving such notice, the Products Company permitted more than five days to elapse before taking action to prevent the use of the check, whatever rights the Products Company might have had to claim the offset were waived; that in making the said agreement and then permitting the five days to elapse, the Products Company estopped itself to contend that the offset should have been allowed.

The facts on which the controversy is based are extremely complicated. The Products Company and another corporation known as Magnolia Finance Corporation, are affiliated concerns, the second (Finance Corporation) apparently a subsidiary of the former (Products Company). The two corporations, both domiciled outside of the State of Louisiana, had established the custom, prior to the season of 1932–1933, of arranging for the financing of their seasonal cotton operations by borrowing from various banks such sums as might be necessary, such loans being secured by the deposit with a trustee for all lending banks of securities furnished by the two borrowing corporations.

Following this custom, and in order to finance the operations for the 1932–1933

season, the two corporations and Interstate Trust & Banking Company, as trustee, as of September 1, 1932, entered into a written agreement under which the Products Company and the Finance Corporation deposited with the bank, as trustee, securities in the form of notes, mortgages, warehouse receipts, et cetera, totaling in value more than $500,000, which, in the said agreement, were declared to be owned by the two borrowing corporations. It was provided in the agreement that the two corporations might borrow, from time to time, from such banks as they might select, such sums as they might find necessary—the total loans not to exceed $1,000,000—and that, on notification to the trustee of each loan made, the trustee should issue to the lending bank a certificate acknowledging the interest of that bank up to the amount of such loan in the pledged and trusteed securities. It was also agreed that the trustee bank (Interstate) might itself make loans and issue to itself certificates of beneficial interest in the pledged and trusteed securities. Among the securities pledged were what are known as "gin mortgage notes", which, from time to time, became due, and to the said trustee bank was assigned the duty of collecting these notes as they matured and of applying the proceeds to the fund out of which, from time to time, repayments were to be made to the lending banks on a pro rata basis. For the season 1932–1933 the loans exceeded $400,000, of which more than $100,000 had been loaned by the trustee bank (Interstate). On July 24, 1933, there was due to the Interstate Bank a balance of $30,000, for the payment of which it, as trustee, held, as security for itself, all of the securities valued at several hundred thousand dollars. That note on that day was renewed, payable in fifteen days, the new note bearing the following stipulation: "All parties hereto hereby authorize and empower said Bank, at any time to appropriate and apply to the payment and extinguishment hereof and of any of the obligations or liabilities, direct or contingent, of any of the parties hereto whether now existing or hereafter arising and whether then due or not due, any and all moneys, stocks, bonds, or other property of any kind whatever now or hereafter in the hands of said Bank on deposit or otherwise to the credit of or belonging to any party hereto, including any moneys or other property in transit to or from said Bank for any purpose."

On August 4, 1933, this note, by a payment of $22,000, was reduced by the Products Company to $8,000. It may be considered significant that the balance which was allowed to remain was $8,000 because this almost exactly represents the sum of the amounts for which the Products Company at that time apparently was contending it should have been credited by the process of offset.

Prior to that time the Interstate Bank, as is well remembered, had, by proclamation of the President of the United States, been placed on a restricted basis, and in its checking account, but not available to the Products Company, there stood on the books of the bank to the credit of the Products Company, $6,677.07. In the account of the trustee, to the credit of the fund created as the result of the agreement of September 1, 1932, there was a credit of $1,347.91. The sum of these two amounts, $8,024.98, it will be noted, if applied as an offset, would have been sufficient to liquidate the balance due by the Products Company on its note for $8,000.

We do not find in the record evidence that at that time the Products Company had demanded that the offset be effected, and all that we may say is that it seems rather obvious, since it cannot be denied that the Products Company was amply able to pay the note, that it hoped that ultimately it would be given credit for the sum of these two balances, and its failure to pay the balance and, in fact, the reduction of the balance to $8,000, indicates plainly that all parties understood that the question of offset was before them.

It is apparent from the record that, during the early part of September, 1933, all of the creditor banks had been paid in full with the sole exception of the trustee bank, and that, therefore, that bank, as trustee at that time, held as security, solely for its own loan of $8,000, all of the securities which had been deposited by the two borrowing corporations.

At that time—during September, 1933—the two corporations, the Products Company and the Finance Corporation, found it necessary to make their customary arrangements for the financing of the 1933–1934 season. The Interstate Bank was then operating, as we have said, on a restricted basis, and therefore the two corporations entered into an agreement with Whitney National Bank to become trustee for the season 1933–1934. It was nec-

essary, of course, that the securities which had been deposited with the Interstate Bank be released, as they were required as security under the new agreement, and yet the Interstate Bank held those securities as collateral for its own claim of $8,000. It was therefore agreed that the Interstate Bank should surrender to the Whitney National Bank all such securities and should receive, as collateral against the $8,000 balance due on the note of the Products Company, a certificate of participation in the amount of $8,000 in the new agreement. The securities were delivered and this certificate of participation was turned over to the Interstate Bank. On January 4, 1934, the Interstate Bank was placed in liquidation and has never reopened.

On January 29, 1934, the liquidators demanded payment of the $8,000 balance due by the Products Company and on January 31, 1934, the Products Company, in reply, advised the liquidators that the sum of the two balances would be more than sufficient to offset the balance due on the note and directed that the said balances be so applied. Nothing was done by the liquidators because at that time they took the position that, for various reasons, the Products Company was not entitled to offset either for the deferred amount ($6,677.07) standing in its name, nor for the deferred amount ($1,347.91) standing to the credit of the trust account.

In July, 1934, all of the loans made for the 1933–1934 season had been repaid with the sole exception of the $8,000 balance which was due to the liquidators of the Interstate Bank and which was represented by the certificate of participation which the liquidators held and which entitled them to a beneficial interest in those pledged securities which the Whitney National Bank held as trustee. Again it became necessary for the two corporations, the Products Company and the Finance Corporation, to arrange for their seasonal financing, and negotiations were opened with the liquidators of the Interstate Bank for the surrender by them of their certificate of participation, since the same securities were to be re-pledged for the next season's operations, and now, for the first time, the liquidators agreed that credit by way of offset should be given for the deferred balance of $6,677.07 standing on their books to the credit of the Products Company. But it is obvious that

they refused to permit the offset claimed for the balance which remained to the credit of the original trust, to-wit, $1,347.-91, for they demanded security for the payment of the balance which would remain due them after giving credit for the offset of $6,677.07.

We think it apparent that the agreement to permit the offset for the balance standing in the name of the Products Company resulted from the fact that, at that time, the Supreme Court of Louisiana had decided the case In re Canal Bank & Trust Company—Intervention of Wainer, which appears in 178 La. at page 962, 152 So. 582. Instead of issuing to the liquidators of the Interstate Bank another certificate of participation in the new trust agreement, the Products Company drew its check on its account in the Whitney Bank, the said check being for $1,600.73, and, after having that check certified by the said Whitney Bank—with the result that the amount thereof at the time of certification was charged by the bank against the account of the Products Company to be devoted to the ultimate payment of the check—the Products Company delivered the said check to the liquidators of the Interstate Bank with an agreement represented by the following letter and acceptance:

"July 30th, 1934.

"Mr. Garner W. Green,
"Attorney-at-Law,
"Jackson, Mississippi.

"Dear Sir:

"You represent the Mississippi Cottonseed Products Company and the Magnolia Finance Corporation.

"The Interstate Trust and Banking Company, In Liquidation, is the holder of a certain note of the Mississippi Cottonseed Products Company in the original sum of $30,000.00 now reduced to a principal balance of $8,000.00, with interest thereon from August 8th, 1933. As security for this obligation, there is held in pledge by the Interstate Trust and Banking Company, in liquidation, a certain Certificate of Participation No. 38 issued on the 19th day of October, 1933 by the Whitney National Bank as Trustee.

"The Mississippi Cottonseed Products Company has a deferred balance in a checking account in the Interstate Trust and Banking Company of $6,677.07. The Mississippi Cottonseed Products Company have requested the offset of this amount

against its aforementioned note, which we have agreed to do, leaving a principal balance due and owing of $1322.93, exclusive of interest.

"The Mississippi Cottonseed Products Company have likewise requested that we release to it the participation certificate of the Whitney National Bank as Trustee, held as collateral. This we have also agreed to do, and have this date accepted in substitution a certified check dated July 30th, 1934 in the sum of $1600.-73; said check being payable to the Interstate Trust and Banking Company and drawn by the Mississippi Cottonseed Products Company.

"It is understood that payment of the balance of $1322.93, etc. due on the note in question shall not be demanded without first giving the Mississippi Cottonseed Products Company five days written notice addressed to its office at Jackson, Mississippi.

"By way of confirmation, kindly acknowledge receipt of this· letter and the return of the participation certificate by signing the enclosed copy of this letter.

"Very truly yours,
"Interstate Trust & Banking Co., In
Liquidation
"By: (Sgd) Chas. W. Hogan,
Liquidator.
"I hereby acknowledge receipt of the above and foregoing this 30th day of July, 1934 and agree thereto and acknowledge receipt of certificate referred to above.
"(Sgd) Garner W. Green."

The record shows that, from this time until the filing of this intervention, the liquidators attempted unsuccessfully to persuade the Products Company to pay the balance due, and, being unsuccessful in this attempt to secure payment, the liquidators, on May 28, 1938, by registered mail, sent to the Products Company and to the Finance Company, the following letter:

"New Orleans, May 28, 1938.
"Registered.
"Mississippi Cottonseed Products Company,
"Jackson, Mississippi.
"Gentlemen:

"In accordance with our letter of July 30th, 1934, addressed to your attorney, Mr. Garner W. Green, at Jackson, Mississippi, we hereby make demand upon you for payment not later than the 6th day after receipt of this letter by you of the sum of $1,322.93, with interest thereon from Au-

gust 8, 1933, representing the balance due on your promissory note in the original principal amount of $8,000. dated July 24, 1933.

"Yours very truly,
"Interstate Trust & Banking Company
In Liquidation,
"By: (sgd) H. T. Andressen
"For Special Agents and Liquidator."

The liquidators, after waiting more than the five days specified in the agreement of July 30, 1934, then cashed the certified check and applied the proceeds to the balance claimed to be due on the note of the Products Company. It is shown· that the amount of the certified check was arrived at by adding to the balance due on the note interest at 7 per cent. for three ·years, which apparently was considered sufficient to permit of the adjustment of the legal and factual questions on which depended the outcome of the controversy over whether or not an offset should be allowed.

The Products Company, insisting that it was at all times entitled to the offset and that it should have been allowed credit therefor, maintains that since, because of the failure of the liquidators to permit the offset, it was required to issue a certified check which was later used as· payment instead of being held merely as security, it should be permitted to recover, by priority over all other creditors of the liquidators, the amount for which it should have been permitted the offset, and contending further that when its check was certified the amount thereof was withdrawn from its use in its bank account, claims that it is entitled to interest on the amount of the said check from the day on which it was certified.

The liquidators, on the other hand, contend that, since more than three years was required to adjust the matter and therefore the amount of the said check was not sufficient to meet the entire balance due on the note, with interest they are entitled to the additional·amount represented by the unpaid interest.

There are presented several most involved legal questions:

First, the liquidators contend that there could have been no offset since the debt was due to the bank in its commercial capacity, whereas the fund, $1,347.91, was held by the bank as trustee.

Second, it is asserted that the fund did not belong to the Products Company, but was, in fact, owned by the Finance Corpora-

tion, since it appears that the said fund resulted almost entirely from the collection of certain gin mortgage notes, which, it is claimed, were owned by the Finance Corporation and not by the Products Company.

Third, it is declared by the liquidators that there was in the trust agreement no stipulation that funds remaining in that trust account might be used to pay the individual debts of the Products Company and that, in the absence of such an agreement, the Products Company at no time had any right to demand that those funds might be applied to its individual debt, and that, while the guarantee of the Finance Corporation contained in the agreement might have obligated it to pay unpaid debts of the Products Company, it did not authorize the latter to appropriate to its individual use funds which under the trust agreement, were held for the credit of both.

Fifth, that a partnership existed between the Finance Corporation and the Products Company and that this prevented the application of the rule of offset, and,

Sixth, that no request for offset was made until after the insolvency of the Interstate Bank had been established as of the date of the formal liquidation and that, therefore, whatever may have been the rights of the Products Company prior to liquidation, insofar as the demand for offset might be concerned, it lost that right when insolvency was established.

Counsel, orally and in their briefs, have discussed at great length the question of whether it is necessary that a depositor, who is also a debtor, actually demand, prior to liquidation, that he be given the benefit to be derived from offset, or whether it is only necessary that such a depositor expressly waive the benefit which is afforded him by Article 2210 of the Civil Code, and they have also discussed all of the other questions to which we have referred.

We think the really important question, however, on which the case was decided in the lower court, depends upon a thorough understanding of the principle which is involved in "facultative compensation". As will be noted from a reading of the decision in the Intervention of Wainer, 178 La. 961, 962, 152 So. 578, 582, "Facultative Compensation is that which operates by the will of the parties, when one of them removes an obstacle resulting from the dispositions of the law". Reference is had to the protection from automatic compensation which is afforded to the depositor by Article 2210 of our Civil Code. There can be no doubt that, with certain exceptions specified in this article, compensation takes place automatically between two debts which are equally due and demandable. But this compensation does not take place automatically where, because of the protection of Article 2210, the depositor is protected against the automatic compensation of which the depositary might otherwise avail itself. It therefore follows, since compensation does not take place automatically where a deposit is involved, that it is necessary, if the depositor is to claim the benefit of compensation, he must waive the effect of Article 2210 of the Civil Code. Now, it also follows that this waiver must take place while the depositary, if there are other creditors, remains solvent, because as soon as, by the insolvency of the depositary, all of the creditors become interested in the distribution of the assets, it is manifestly improper to permit one depositor, by waiving the benefit of the article of the Code, to obtain full compensation to the detriment of the other creditors. Since a waiver is necessary and since it is necessary that such waiver be made prior to the establishment by the liquidation proceedings of the insolvency of the bank, it is obvious that the Products Company must establish the fact that it waived the protection of the article of the Code and demanded compensation prior to the liquidation of the bank and that it maintained that position in its further dealings with the bank and the bank's liquidators.

Counsel for the Products Company maintain that, even if the first actual demand for offset was made after the bank had been placed in liquidation, no significance should be attached to this fact; that compensation takes place automatically and that, therefore, no demand for the offset was necessary, and, in the second place, they maintain that, where such a demand is made, the time at which it is made is of no importance and the offset takes place retroactively as of the time at which the two debts were first and at the same time demandable.

But let us repeat and emphasize the fact that, while, ordinarily, compensation or offset takes place by operation of law and, therefore, automatically, it does not, as we have shown, take place in the case "of a demand of restitution of a deposit and of a loan for use" unless and until the effect of Article 2210 of the Civil Code is waived, and it follows that, unless there is a waiver by

the depositor of the effect of that article of the Code, there is no offset.

They argue, however, that even if this is true, since the quoted provision of the article of the Code is obviously intended to protect the depositor, there is no necessity that the depositor expressly waive his rights under it if it is obvious that a waiver of its protection will benefit him, the depositor. So far, no Supreme Court adjudication on this point has been called to our attention. But our brethren of the First Circuit, in Watkins v. Bank of Morgan City & Trust Company et al., La.App., 162 So. 262, considered a case in which this identical question was of importance and there held that, because of the article of the Code, compensation does not take place automatically where a deposit is involved, and that there must be an express waiver by the depositor of the benefit afforded him by the article if compensation is to be availed of. In fact, the necessity for waiver is plainly shown in many of the decisions rendered since the bank catastrophe out of which this suit resulted.

In Brock et al. v. Pan American Petroleum Corporation, 186 La. 607, 173 So. 121, 123, the court quotes from Intervention of Wainer, supra, to the effect that a provision in a note authorizing the application of the deposit to the payment of the note "is a mere waiver * * *" of the obstacle of article 2210 of our Civil Code.

While it is true that, so long as the bank remains solvent, it is of little importance just when the waiver is made, as soon as liquidation proceedings are commenced it becomes of supreme importance to determine whether the waiver was made prior to liquidation since no longer, then, is the question of interest only to the two parties. All other creditors are then also concerned. In the Watkins case, supra, it was held that, after insolvency, the depositor may no longer claim the right of compensation by waiving the benefit afforded him by the codal article. There the court said [162 So. 264]: "Plaintiff in no way authorized the application of his deposit to the payment of these notes until some three months after the bank had been placed in liquidation by the state authorities. The rights of the parties were then very different from what they had been while the bank was solvent. The question, therefore, is as to whether, after a bank has become insolvent, the depositor can demand such application of his deposit to the payment of his note. Evidently he cannot. In the above-cited case in [Thomas v. Marine

Bank & Trust Co.] 156 La. 941, 101 So. 315, the court said: 'Bank cannot apply funds on deposit to payment of debts of depositor without agreement to that effect, nor can they be set off against depositor, especially where depositor is another bank which has become insolvent, requiring collection in due course of liquidation by bank examiner, and then only to extent of distributive share of assets.'"

This seems to be directly contrary to the view of counsel for the Products Company that the time at which the waiver is made is of no importance even though liquidation has been commenced. Again we find that, in Brock et al. v. Black, Rogers & Company, Ltd., 192 La. 49, 187 So. 51, 52, the Supreme Court, referring to many cases in which this identical question was of importance, said: " * * * The basis of the decisions of this Court in these cases is that the taking over of the property and assets of the bank by the State Bank Commissioner for liquidation deprives the bank of the administration of its property and assets and fixes the rights of all parties and after that moment the bank has no longer the faculty of paying its debts by compensation or otherwise, and the depositor is entitled to only his pro rata share of the assets of the closed bank and only at such time as the State Bank Commissioner may be able to make an equitable distribution of those assets in the form of dividends."

The view of counsel on this point is based, we think, on the erroneous interpretation of the decision rendered by the Supreme Court in Brock et al. v. Pan American Petroleum Corporation, supra, and in Brock et al. v. Black, Rogers & Company, Ltd., supra, and other cases referred to in their brief. In the Pan-American Petroleum case it is true that the court said: "These cases settle the question that compensation, when decided by the court to be legal, has a retroactive effect to the day both debts, simultaneously existing, are liquidated, due, and demandable."

But the facts of that case showed clearly that the demand for the offset had been made prior to the day on which the bank was placed in liquidation and the court said that, since the demand for offset had been made prior to the time at which the bank was placed in liquidation, "it is * * * unimportant that defendant corporation made its plea of compensation * * * after the * * * [bank] had been placed in liquidation * * * ". Note the word "plea", which, in this case, refers to the ap-

pearance in the liquidation proceedings and not to the demand for compensation, which had been made prior to liquidation proceedings. And, in fact, a reading of all of those cases shows that it is definitely settled that the waiver is necessary and that the waiver must be made before the rights of other creditors are fixed by insolvency.

■ We think it reasonably clear that, prior to liquidation, the Products Company must have demanded compensation, and we say this because of the fact that it did not pay the $8,000 balance due after the operations of the season 1932–1933. We consider it most significant that this corporation, which is shown to have been amply solvent and to have had no difficulty in meeting its obligations, should have allowed this one obligation for a comparatively insignificant amount to remain outstanding, and we believe it obvious that the reason was that it felt that it was entitled to offset the two credit balances against the debit balance remaining on its obligations, and that, if it should pay the debt, it would lose this right to compensation. And we think it also significant, in substantiation of the contention that compensation must have been demanded, that, on the first occasion after the decision in the Wainer case—on which occasion it became necessary for the liquidators of the bank to decide whether or not they would allow compensation—they immediately agreed that, in accordance with the result reached in the Wainer case, they must allow compensation insofar as was involved the account, in which no other person or corporation that the Products Company had any semblance of interest. It seems obvious that the sole purpose in maintaining the status quo of the two accounts up to that time was uncertainty as to the legal question concerning right · to compensation, and since, at the time, the liquidators of the bank agreed to permit compensation on the unquestioned deposit, it is obvious that the demand must already have been made, because, when they allowed that offset, liquidation proceedings had already been commenced. Surely the demand for compensation which they recognized then as to that account must also have been made as to the other.

But we must remember that, concerning that other account, there were many questions which had not been settled and in the solving of which the decisions in the Wainer case and in other cases were of no assistance. The question of whether or not the fund belonged to the Products Company and those other questions which we have already mentioned as having been raised by the liquidators were in no way settled by that or any other case, and it would have required litigation to determine many of those questions.

■■ At that time the liquidators had in their possession a certificate of participation which would have completely prevented the `refinancing operations of the two borrowing corporations and they could thus have forced a settlement of those questions and the payment of their note, either in cash or by the effect of offset, at that time. It is obvious that the Products Company did not choose to bring the matter to an issue at that time and that it voluntarily entered into the agreement represented by the letter hereinabove quoted, and in that letter it seems to us that it voluntarily placed upon itself the onus of either permitting its check to be used at some future date for the payment of the debt, or of bringing the necessary proceedings to prevent this result. As we have shown, facultative compensation depends upon the will of one of the parties—depends upon the waiver by that party of the right of the protection of the article of the Civil Code—and, if so, surely that party would have the right, although he might at one time have placed himself in the position of demanding the compensation, to waive that right and to substitute some other method of settling the controversy with his creditor. Therefore, with all of the questions which were then pending in view, when the Products Company gave to the liquidators its certified check and agreed with the liquidators, in effect, that that check might be used after five days' notice, it seems to us that it agreed that within that period of five days it would take such steps as it might find advisable to prevent the use of the said check, and that, when it did not do so, it effectually deprived itself of the right to insist on the compensation, which, otherwise, it might have had the right to demand. But it is said that the check was not given in payment, but merely as security.

■ In considering this last question—whether the agreement of July 30, 1934, should be construed as contemplating merely the substitution of collateral; that is to say, the substitution of the certified check in place of the participation certificate—and that, therefore, after the giving of the five-day notice contemplated by that agreement, the burden of bringing suit to determine

whether the offset should be allowed was placed equally upon the liquidators of the bank and the Products Company, we cannot overlook the fact that it would seem rather absurd to substitute a certified check and then to provide that the check should not be used without first bringing suit to determine whether or not the holder of the said check should have the legal right to use it. It is true that in one of their letters to the attorney for the Products Company the liquidators made the following statement: "We shall thank you to please give attention to our letter of April 10th, with reference to your note now having an unpaid balance of $1,322.73 plus interest from August 8th, 1933. We have carried this matter in abeyance for nearly three years and ask that either you have your attorneys take a rule against us to establish your rights in the matter, or if you prefer we shall institute suit against you in an effort to bring the matter to an early conclusion."

But this was merely an offer on the part of the liquidators to bring such a proceeding. if the Products Company demanded it, and the Products Company made no such demand and thus did not accept that offer.

This view of the matter makes it unnecessary that we discuss any of the other contentions raised concerning the right of the Products Company to demand compensation in any event, for, conceding that it had the right and that the position taken by the liquidators on all those other questions is erroneous, nevertheless the Products Company has, by its action, waived that right by its agreement that it would bring suit within the specified time.

The liquidators are not entitled, we think, to the additional interest claimed. Under the conclusion reached by us, the giving of the check constituted payment, of which the liquidators might avail themselves at any time by the mere giving of five days' notice. They could not delay in giving this notice and then claim that, because of the delay, additional interest had accrued.

Of course, the denial of the relief prayed for by the intervenor in no way affects its right as an ordinary creditor in the liquidation proceedings.

For the reasons given, it is ordered, adjudged and decreed that the judgment appealed from be and it is amended by the dismissal of the reconventional demand for $169.74, and that, as thus amended, the judgment be and it is affirmed, all at the cost of appellant.

Amended and affirmed.